**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SHERI L. GIORDANO, | : | |
| | : | Civil Action No. 07-1348 (PGS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | OPINION |
| MICHAEL J. ASTRUE | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

This matter is an appeal of plaintiff Sheri L. Giordano from the Commissioner of Social Security Administration's final decision denying her application for Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

History and Testimony of Plaintiff

Giordano filed for Disability Insurance Benefits on March 12, 2003, and for Supplemental Security Income on October 17, 2003, alleging disability since July 1, 2002 due to a history of an "unknown blood virus associated with full body blisters, severe headaches, fever, stomach pain, Hepatitis C, asthma and extreme fatigue." She also reports a history of bronchitis and a mental disability (R. 70, 71, 114). Her claim was denied at the initial level (R. 31-33) and on reconsideration (R. 41-43). A Request for Hearing was timely filed and on September 30, 2004 a hearing was held before ALJ Dennis O'Leary. On November 5, 2004, the ALJ issued an unfavorable decision. Plaintiff requested a review by the Appeals Council (R. 11) and on January 26, 2007, the

Appeals Council found no grounds for review (R. 7- 10). This action was thereafter timely commenced.

Plaintiff is a 35 year old woman. She is currently living at home with her mother and 25 year old sister. She is a high school graduate with two years of college (R. 94). According to plaintiff, she was last employed in 2001 as a customer service representative for Aerosols, where she performed data entry, and talked to customers on the telephone. Plaintiff is recovering from polysubstance drug abuse, including heroine addiction. She testified that she was fired from her job at Aerosols because of her drug addiction when she started arguing with people and missing a lot of time from work (R. 454). The record shows that she had additional retail work experience from 1995 to 2000. She has also worked as an imports clerk (1992-1994) and administrative assistant (1990-92) (R. 72).

According to plaintiff, her extensive drug and alcohol use started when she was 13 years old when she began drinking (R. 403, 455). She reported that she used heroin for 12 years, 10-15 bags a day, primarily through injection. In the past, she had used cocaine (3-4 times a week), ecstacy (30-40 times), LSD (20-30 times) and angel dust (10 times). She would drink alcohol about twice a month. In the past she would sometimes use morphine or valium to help her cope with her heroine addiction. She has undergone many detoxification programs and inpatient treatment for drug addiction. Most recently, she had been attending an "open door program" with some success. She reported being physically beaten by her father as a teenager and witnessed her mother being beaten by her father (R. 403). She had not used drugs since March, 2002.

With regard to her pulmonary problems (asthma and recurring bronchitis), she has been treated by Dr. Wolf of Pulmonary Internists for about 13 years (R. 457). She takes Advair, Proventil,

Flonase, and Zyrtec every day. Her breathing is strained in the mornings until she takes her medication (R. 459). On an average day, she can walk two blocks before experiencing shortness of breath. She also testified that picking up a grocery bag or laundry can cause her to feel short of breath. When her asthma becomes more severe, it lasts a couple of hours to a couple of days and she uses her nebulizer (R. 462). She reported that approximately every two months her flare ups require antibiotics and a steroid (Prednisone). She uses Proventil often during the day for relief from her symptoms. (R. 463). It makes her feel jittery and jumpy and makes her heart race, and tired at the same time because her lungs are tight. Cold air exacerbates her asthma and bronchitis as does extreme humidity in the summer (R. 464). The same is true for perfume, cigarette smoke and cleaning products. She stated she can be on her feet for about two hours on a typical day before her breathing acts up. Her allergies bother her a few times a month.

With regard to her psychological and drug addiction problems, plaintiff testified that she currently visits the Strathmore Methodone Clinic and University Behavioral Health Care for counseling. At the time of the hearing, she had been clean for eighteen months. She is also attempting to wean off of methadone.

Plaintiff testified that she goes to University Behavioral Health Care every two weeks for panic attacks, nervousness, and difficulty with focus and comprehension due to racing thoughts (R. 467). She is working with her therapist to help her talk and deal with people. She feels very nervous being in public or around people and feels like they are judging her and it makes her very angry. She also experiences panic attacks where she sweats, becomes nauseous, is unable to breathe and feels lightheaded (R. 469). She has to walk out or "escape" from situations to regain control of herself (R. 470). These panic attacks have occurred even since she has been clean from drugs. Plaintiff

does not feel that she could work at a desk for a whole day without having a panic attack. When asked if she could work a whole day at a sedentary job, she stated "No. No. No, because I can't - - I have to learn how to deal with these people and also, you know, I feel like I feel very closed in and can't get out of my head.  I feel crazy in my head."  (R. 478).

Plaintiff confirmed that she has been diagnosed with obsessive compulsive disorder which makes it difficult to make decisions (R. 474).  She drives, but for only for short periods of time; and she goes to the store approximately once or twice a  week. When she arrives at the store, she only remains  inside for about ten minutes because she becomes anxious.  When using drugs, the drugs would alleviate the anxiety.  She is having anxiety and panic attacks all of the time now that she is clean. She testified that she smokes about twelve cigarettes a day, and that her asthma doctor has advised her to quit smoking.  She stated she was taking Lexipro,[1] and her psychiatrist may increase her dose because it was not working for her.  She testified that she stays in her room watching TV, or trying to read, but has difficulty due to concentration problems.   She does not socialize and has no friends.  (R. 468).

Medical Reports

The record contains medical records starting in January 1995 indicating that plaintiff was treating for persistent symptoms including bronchitis, moderate wheezing, and shortness of breath. She was treated by her primary physician approximately thirty times in a eight-year period (R. 231-256).  She also was treated at MediCenter of Edison Emergency Room on February 10, 2000, (R. 189) June 26, 2000, (R. 188) November 6, 2002, (R. 186) and January 28, 2003, for symptoms of

---

[1] Lexapro is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs).

bronchitis and asthma (R. 184).  Plaintiff also treated at JFK Medical Center Emergency Room for exacerbations of asthma on January 26, 2001 (R. 153-159) and April 10, 2002 (r. 166)-170), where she was treated with Provenil, Flovent, Zithromax and Prednisone and released.

Barry Z. Wolf, M.D. of Pulmonary Internists, characterized plaintiff's pulmonary impairments as mild to moderate (R. 424).  He observed plaintiff become short of breath with wheezing without exertion.  She was prescribed Advair and Proventil for her symptoms without serious side effects.  Dr. Wolf found that she could walk 2-3 hours in an 8 hour day, stand 2-3 hours and sit 6-7 hours in a eight hour day. In addition, he found that could lift and carry up to ten pounds frequently.  However, he also stated that she had frequent episodes of her pulmonary condition which render her disabled for 3-7 days approximately every 4-6 months  (R. 425)

On November 16, 1999, plaintiff was admitted JFK Medical Center for jaundice and elevated liver enzymes, and she was diagnosed with hepatitis C (R. 140-152). An ultrasound of the gallbladder confirmed a high probability of inflammatory disease.  The records of JFK Medical Center (September 14, 2001) show that plaintiff was treated for headaches and vomiting after using heroin (R. 160).

Plaintiff also suffers from a skin condition which started in approximately 2000 which is characterized as skin lesions covering the torso and upper and lower extremities on both sides of the body with scabbing.  She has been treated by various dermatologists in order to cure the condition. On July 17, 2002, Dr. Strauss, a dermatologist, noted a diagnosis of impetiginized atopic dermatitis (impetego). She was treated with Levaquin and cutivate ointment (R. 284, 297-98).  Roger Brodkin of the Center for Dermatology in West Orange examined plaintiff two times for excoriations of the skin.  He indicated that she had no physical limitations which would affect her ability to work (R.

178-79).  Plaintiff's treating physician's notes of April 30, 2003 document generalized rash and scabbing covering skin with itching and pus discharge (R 230).  One doctor thought that her rash may be infectious in nature and referred her to a specialist (R. 307).  NYU Skin Clinic notes dated June 19, 2003, document numerous scattered blisters on face, chest, upper and lower extremities and diagnosed her skin condition as excoriations secondary to pruritus of unknown etiology (R. 323-335).  Notes from a December, 2003 visit to the clinic indicated that they recommended tapering plaintiff's methadone as quickly as tolerated.   Plaintiff sought emergency room services once at JFK Medical Center on February 27, 2003, for open blisters on face, trunk, buttock, hips, and all extensor surfaces or extremities with fever associated with history of chronic disseminated pruritic vesicular rash. She was advised to see an infectious disease doctor, and diagnosed with nonspecific dermatitis.

  At the hearing, the ALJ confirmed her lesions were all over her body. She stated she has had blood tests, biopsies, and blood cultures to diagnose the problem.  She stated that when she is nervous she itches and scratches herself, causing the skin lesions.  She also testified that she cuts herself with tweezers or scissors because of the itching, and that makes it feel better to some degree (R. 473).  She stated that her doctor believes that there is nothing medically wrong with her, and that she is causing the skin condition.

  A Residual Functional Capacity Assessment done on July 13, 2003, rated plaintiff with no exertional, postural, manipulative, visual, or communicative limitations. The assessment suggested an environmental limitation where plaintiff should avoid concentrated exposure to fumes, odors, gases, poor ventilation, etc. (R. 339-46).

Dr. Eric Kirschner, Ph.D. of Internal Medical Associates in Newark performed a psychiatric examination on December 16, 2003. Her psychiatric history revealed no history of psychiatric hospitalizations. Plaintiff told the doctor that she had been attending counseling sessions for eight years at the Strathmore Methadone Clinic, and that she goes twice a month for hour-long sessions. In addition to symptoms previously mentioned, plaintiff told Dr. Kirschner that since she has been off drugs and on methadone, she has difficulty falling asleep (she wakes five or six times a night) and had gained sixty pounds since using methadone. She reported dysphoric mood, psychotoror retardation, crying spells, feelings of guilt, hopelessness, loss of interest, and irritability. In addition, she has diminished self esteem and feelings of worthlessness. She denied suicidal ideation. She is excessively worried and has panic attacks. She denies symptoms of thought disorder, but reported short term and long term memory problems and concentration difficulties. Dr. Kirshner found her to be cooperative and her manner of communicating was adequate. She was well groomed. Her gait, posture and motor behavior were normal. Eye contact was appropriate. She had fluent speech. She was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. Her affect was dysphoric and her mood dysthymic. Her concentration was intact. Her memory was mildly impaired. She was of average range of intelligence with fair judgment and insight. She can dress, bathe, groom, cook, and prepare a meal. She can do general cleaning, laundry, and shopping. She manages her money and drives an auto. She spends most of her time watching television, listening to the radio, or reading. She follows and understands simple instructions, and performs rote tasks. She can concentrate and consistently performs simple tasks. She can relate to others, but is unable to deal with stress. Dr. Kirschner's diagnosis included major depressive disorder, severe, without psychotic features, generalized anxiety disorder, and polysubstance abuse in full remission; asthma,

bronchitis, and hepatitis C (R. 353).  She was advised to continue drug treatment and individual psychotherapy.  Her prognosis was guarded.

Plaintiff underwent an additional psychological examination on May 26, 2004 at University of Medicine and Dentistry  (R. 401).   Plaintiff reported a history of violence, as noted above.  In addition, she  reported that she threw a screwdriver at her sister during a fight in May, 2004, and engaged in fist fights with people at her job when she was working (R. 402).  At the time of this examination, she had been clean and sober for two years (R. 405).  She was found to be fully oriented, of average intelligence with impaired concentration and attention.  Her memory and abstract thinking were intact. Knowledge, insight and judgment were fair.  Her diagnosis was polysubstance dependence, depressive disorder, obsessive-compulsive disorder, asthma, hepatitis C and bulimia nervosa.   She was found to have moderate symptoms or difficulty in functioning (GAF 55)[2] (R. 408).

A mental Residual Functional Capacity Assessment was performed on January 28, 2004. Plaintiff was found not to be significantly limited in understanding and memory, sustained concentration and persistence, social interaction or adaptions. She was found moderately limited in the areas of carrying out detailed instructions, working in coordination with others without

---

[2]The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults. The scale is presented and described in the DSM-IV (Diagnostic and Statistical Manual of Mental Disorders). A rating of 41-50 denotes serious symptoms, or, any serious impairment in social, occupational, or school functioning; a rating between 51-60 indicates moderate symptoms, or,  any moderate difficulty in social, occupational, or school functioning.

distraction, and in her ability to complete a normal work schedule without interruption from psychologically based symptoms (R. 375-78).

The Psychiatric Review Technique form (mandatory in disability claims involving mental impairments) placed plaintiff in category of 12.04 Affective Disorders; 12.06 Anxiety Related Disorder; and 12.09 Substance Abuse Disorder. With regard to those categories, plaintiff was rated with no limitation in restriction of daily living or difficulties in maintaining social functioning. She was rated "moderate" in difficulties maintaining concentration and persistance, and there was "insufficient evidence" to rate her limitations as to repeated episodes of deterioration in the "B" criteria of the listings. The evidence did not establish the presence of the "C" criteria of the listings (R. 255-258)

A Physical Residual Functional Capacity Assessment was administered on January 28, 2004 by review of the record (not a physical examination) (R. 369). The primary diagnosis was "excoriations secondary to pruritus of unknown etiology"; secondary diagnosis of asthma and history of hepatitis, headaches, and fatigue. There were no exceptional, postural, manipulative, visual, communicative limitations found. She was found to have an environmental limitation with regard to fumes, odors, gases, and poor ventilation.

Dr. Martin Fetchner testified as a medical expert at plaintiff's hearing. He reviewed plaintiff's asthma, skin condition, and hepatitis C and found that her condition did not meet or equal any listings. His opinion as to RFC was light. He thought she could lift twenty pounds occasionally, ten pounds frequently, and stand and walk an aggregate of six hours in an eight-hour day.

Mr. Rocco Meola testified as a vocational expert at plaintiff's hearing. He stated plaintiff was a younger individual with a high school education and some college who had been working in

an office setting performing customer service work and basic office work, which is classified as sedentary and semi-skilled. He testified that there are jobs available in the local and national economy for persons such as plaintiff, who is restricted to light work and work where there is no undue concentrations of dust, smoke, fumes or other pulmonary irritants ( R. 484). Such jobs would include scaling machine operator, weld inspector, and ticketer. He stated there were approximately 1,800 such jobs in northern New Jersey. With a further restriction to sedentary work for the same individual, there are approximately 1,000 jobs such as addresser, sorter, and document preparer in northern New Jersey.

Plaintiff's attorney questioned Mr. Meola about his findings. Mr. Meola agreed if her condition were worse than he found, she would not be able to find work. For instance, Mr. Meola conceded that plaintiff could not work if it were found that she had difficulty remaining in one place for more than 20-30 minutes, becoming anxious and jittery being around and talking to people, and difficulty and confusion with concentrating when reading. The expert testified that these symptoms would prohibit or limit such a person from doing sedentary work or light work. More specifically, Mr. Meola testified:

> Atty: If someone had difficulty remaining in one place for more than 20 or 30 minutes at which point they would become tense, anxious and have to leave and walk around or go out and get some air would that impact on that person's ability to do even sedentary employment?
>
> VE: Yes. It would have a negative effect on the ability to do sedentary employment.
>
> Atty: If someone in addition to that were negatively effected by any kind of stress that would also cause them to become anxious and jittery, maybe people coming up and talking to them or being around people that they think are talking to them, would that impact on the person's ability to do sedentary work?

10

VE: Yes. It would prohibit them or limit them from doing sedentary type of work.

Atty: With regard to concentration and attention and persistence, given Ms. Giordano's testimony that she tries to read a book, she may read the first sentence or the first paragraph over and over again, can't seem to get beyond that, get's confused, can't seem to focus, how would that impact on a person's ability to do sedentary employment?

VE: From what she described, in my opinion, she would not be able to do any type of sedentary work.

Atty: Would that be the same for light work?

VE: Yes.

Atty: Are you familiar with the GAF scale?

VE: Roughly, yes,

Atty: It's indicated in the record that Ms. Giordano's GAF is 55. Are you sufficiently familiar to comment on how you think that would impact or not?

VE: I know that above 50 is usually a person who can function in a pretty sheltered environment that they may not have -- they may not be able to function in all environments and make decisions and things of that nature. Certainly below 50 it would prohibit them from working in a competitive labor market.

Atty: With all of the various difficulties that I have posed to you, the inability to make appropriate decisions, the difficulty dealing with stress, the difficulty remaining in one place before one needs to move around, the difficulty with concentration and attention, if in fact all those things are as Ms. Giordano has described them and if an individual has those problems, is that a person that can engage in substantial gainful activity?

VE: In my opinion, no.

Atty: I have no other questions.

11

Legal Standard for Disability

A claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. *Id.* at § 423(d)(2)(A); *see Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing. *Sykes*, 228 F.3d at 263 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. §405(b). The Act also grants authority to the Social Security Administration to enact regulations implementing these provisions. *See Heckler*, 461 U.S. at 466; *Sykes*, 228 F. 3d at 262.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); see 42 U.S.C. §405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. § 405(g)*; Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.*" Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); see *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*,

12

402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422.  The reviewing court must view the evidence in its totality.  *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).   The Third Circuit has stated:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence - - particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987).  A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.  But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence."  *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

The Social Security Administration has developed a five-step process set forth in the Code of Federal Regulations for evaluating the legitimacy of a plaintiff's disability.  20 C.F.R. § 404.1520. The controversy here concerns Step Five, so the Court's analysis starts there.

The ALJ found that Giordano could not perform her past relevant work as a customer service representative at Aerosols where she performed data entry and assisted customers on the telephone (Step Four).  Accordingly, the ALJ proceeded to step five of the analysis where the burden shifts to the Commissioner to show there is work in the national economy that Giordano can perform.  *See* 20 C.F.R. §  404.1520(f);  *Sykes*, 228 F.3d at 263 (citing *Yuckert*, 482 U.S. at 146 n.5); *Burnett*, 220

13

F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ can utilize the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, in certain limited circumstances. The grid only concerns exertional impairments. 20 C.F.R. § 404, Subpt. P, App.2. However, when determining the availability of jobs for plaintiffs with exertional and non-exertional impairments, "the government cannot satisfy its burden under the Act by reference to the grids alone;" because the grids only identify "unskilled jobs in the national economy for claimants with exertional impairments who fit the criteria of the rule at the various functional levels." *Sykes*, 228 F.3d at 269-70. Instead, the Commissioner must utilize testimony of a "vocational expert or other similar evidence, such as a learned treatise," to establish whether the plaintiff's non-exertional limitations diminish his residual functional capacity and ability to perform any job in the nation. *Id*. at 270-71, 273-74; *see also Burnett,* 220 F.3d at 126 ("A step five analysis can be quite fact specific, involving more than simply applying the Grids, including… testimony of a vocational expert.") If this evidence establishes that there is work that the plaintiff can perform, then the claimant is not disabled. 20 C.F.R. §404.1520(f).

At Step Five, ALJ O'Leary found that there were jobs in the national economy which Giordano could perform. ALJ O'Leary relied on Medical-Vocational Rule 201.27 in order to reach his decision. ALJ O'Leary inexplicably failed to evaluate non-exertional impairments of plaintiff and specifically the testimony of Rocco Meola, the vocational expert. Meola's testimony is crucial to the outcome of the case; and part of his testimony appears to be in conflict (*see* Opinion, p. 10-11).

ALJ O'Leary seemingly found that Giordano's "nonexertional limitations" do not compromise her ability to perform sedentary work. However, once non-exertional impairments come into play, the ALJ may not exclusively rely on the grids. *Green v. Schweiker* 747 F. 2d 1066, 1072 (3d Cir. 1984). At this point, the ALJ has two duties. First, to seek and evaluate testimony of a vocational expert; and secondly, make findings of fact and conclusions of law regarding the testimony. In this case, O'Leary properly entertained the testimony of a vocational expert to evaluate such non-exertional limitations; but failed to engage in prong two. That is, the ALJ did not explain whether he accepted or rejected Meola's testimony, or whether the Commissioner sustained his burden of proof at Step Five. *Cotter v. Harris*, 642 F. 2d 700 (3d Cir. 1981). This Court cannot conduct [its] substantial evidence review" without knowing the ALJ's evaluation of the vocational expert's testimony and his reasons for such assessment. *Walton v. Halter*, 243 F. 3d 703, 710 (3d Cir. 2001).

The Commissioner argues that the failure to evaluate the vocational expert's testimony is a technicality because a review of the transcript supports the ALJ's decision. This argument misses the point. The ALJ as trier of fact has an important function in that evaluating the credibility of witnesses, and applying the credible facts to the law. Through a perusal of the transcript, this Court can not deduce what findings and conclusions the ALJ made with regard to Meola's testimony. The case law demands a substantial evidence review be grounded on actual findings of fact and conclusions of law with regard to step five analysis. *Sykes v. Apfel*, 228 F. 3d 359 (3d Cir. 2000); *Jesurum v. Secretary*, 43 F.3d 114 (3d Cir. 1995).

The matter is remanded for further findings with regard to Step Five of the determination process.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

March 11, 2008